IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LABORATORY CORPORATION OF
AMERICA HOLDINGS,

          Plaintiff,

      v.

PAUL DORAN and
NATERA, INC.,

          Defendants.

**CASE NO.**  1:24-cv-1029

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
ITS APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND
<u>PRELIMINARY INJUNCTION, AND FOR EXPEDITED DISCOVERY</u>**

Pursuant to Fed. R. Civ. P. 65 and 26, Plaintiff Laboratory Corporation of America Holdings ("Labcorp") submits this Memorandum of Law in support of its Application for a Temporary Restraining Order and Preliminary Injunction and for expedited discovery.

## PRELIMINARY STATEMENT

This application arises out of former Labcorp employee Paul Doran's ("Doran") breaches of his restrictive covenants, including covenants not to compete with Labcorp, not to solicit Labcorp customers or prospects, and not to disclose Labcorp's confidential information. Direct evidence exists of Doran's breaches of his covenants not to compete and not to solicit.

In consideration for, and as a condition of, his re-employment with Labcorp as a Senior Marketing Executive, Doran agreed to be bound by a restrictive covenant agreement that expressly prohibits him, for twelve months following the termination of his employment, from, among other things: (1) commencing employment with a competitor of Labcorp in which he performs duties that are the same, substantially similar, or substantially related to the duties he held at Labcorp in the same geographic areas; and (2) soliciting customers or prospects of Labcorp with whom/which he had contact (together, the "Restrictive Covenants"). The Agreement further prohibits him from disclosing Labcorp's highly valuable confidential and proprietary business information (the "Confidential Information").

Doran's employment at Labcorp spanned, in total, approximately thirteen years. He began working for Labcorp in June 2010, as an Internal Account Specialist, and was promoted to various roles over the next 10 years. In November 2021, following a brief break in service, Doran was re-hired by Labcorp as a Senior Marketing Executive, a position in which he was responsible for securing, maintaining, and growing key strategic accounts in several geographic areas within Manhattan (the "Geographic Territory"), with a focus on women's health, oncology, and organ transplant diagnostic

testing (the "Specialty Areas"). All of these Specialty Areas are highly lucrative and uniquely competitive, which makes Doran's breaches of the Restrictive Covenants particularly threatening to Labcorp.

By virtue of his senior role and the Specialty Areas in which he focused, Doran was privy to inordinately valuable confidential information about Labcorp and its business, including its products, product pipeline, pricing, and pricing and sales strategies in, among other areas, the Specialty Areas. His position also enabled him to have close access to Labcorp's highly coveted customers and prospective customers in the Specialty Areas in particular. Because Doran directly solicited and negotiated agreements with these customers, he was (and remains) intimately familiar with their present and future needs, and the specific terms of their current contractual relationships with Labcorp.

Despite the clear terms of the Restrictive Covenants to which Doran voluntarily agreed, his duties at his new employer, Natera Inc. ("Natera"), are the same as, substantially similar to, or substantially related to those he performed at Labcorp. Indeed, Doran is actively selling the exact same services to the same highly coveted existing and prospective customers in the Geographic Territory in crystal clear direct breaches of the Restrictive Covenants.

Natera, by its own admission, has knowledge of the continuing contractual relationship between Labcorp and Doran, including of the Restrictive Covenants. Nevertheless, Natera has permitted, facilitated, and/or encouraged Doran to engage in conduct in direct violation of the Restrictive Covenants. Labcorp has repeatedly attempted to resolve Doran's breaches of the Restrictive Covenants without having to engage in litigation. Those good faith efforts have failed, and Doran, as an agent of Natera, has continued to actively pursue Labcorp customers and prospective customers in the Geographic Territory. Injunctive relief is necessary to prevent continued and further violations of the Restrictive Covenants resulting in irreparable harm to Labcorp.

2

## STATEMENT OF FACTS

### A.   Labcorp's Business

Labcorp provides medical laboratory diagnostic tests and services, which it markets and sells to health and hospital systems, physician practices and networks, and other healthcare providers (together, the "Medical Providers") throughout the country. (*See* Declaration of Alissa Farrier ("Farrier Decl.") (attached hereto as Exhibit 1) ¶ 2.)  Labcorp offers a wide variety of testing and diagnostic services in areas, including the Specialty Areas. (*Id.* ¶¶ 2,12.) Labcorp provides its testing and diagnostic services directly to the Medical Providers, partnering with them to offer tailored testing and diagnostic services that enable these Medical Providers to serve their patients. (*Id.* ¶ 2.) The diagnostic testing market is highly competitive and inordinately relationship driven, and typically it takes years to develop the close personal relationships with the Medical Providers required to land, maintain, and expand business with them. (*Id.* ¶ 3.) The key to developing, maintaining, and expanding those relationships is understanding the precise current and future needs of the Medical Providers, and offering them carefully crafted sales strategies and plans that enable them to meet those needs. (*Id.* ¶ 3,4.) Labcorp's sales strategies and plans are highly confidential and only shared with those Labcorp employees who require the information to perform their job functions. (*Id.* ¶ 4.)

### B.   Doran's Initial Employment at Labcorp

Doran began his employment at Labcorp in June 2010, working as an Internal Account Specialist.  (Farrier Decl. ¶ 6.)  In October 2013, he was promoted to a Key Account Executive position.  (*Id.*) In October 2017, he was promoted to a Senior Marketing Executive position.  (*Id.*) In February 2018, he was promoted to a Divisional Sales Trainer position, where he developed and executed national, regional, and individual training programs for Labcorp sales employees.  (*Id.*) He

3

left Labcorp in August 2021, to pursue another opportunity, and was re-hired by Labcorp in October 2021. (*Id.*)

## C.  Doran Agrees To Restrictive Covenants In Consideration For His Re-Hire at Labcorp as a Senior Marketing Executive

On October 15, 2021, Doran accepted an offer of employment to re-join Labcorp as a Senior Marketing Executive and started employment in November 2021. (Farrier Decl. ¶¶ 7-10; *see also* Farrier Decl. Exhibit A (a true and correct copy of Doran's Executed Offer Letter).) In consideration for, and as a condition of, his employment, Doran agreed to be bound by a Confidentiality, Nonsolicitation, and Noncompete agreement (the "Agreement"). (*Id.* ¶ 8; Farrier Decl. Exhibit B (a true and correct copy of the Agreement).) Doran voluntarily executed the Agreement on October 15, 2021. (Farrier Decl. ¶ 9.)

The Agreement includes a non-competition provision stating, in relevant part, that:

> During your employment and for a period of twelve (12) months following your voluntary or involuntary termination of employment, you shall not become an owner in, shareholder with more than 2% equity interest in, investor in, or an employee, contractor, consultant, advisor, representative, officer, director, or agent of, a trade or business that offers products and services that are the same or substantially similar to the products and services provided by [Labcorp] in any geographic market in which [Labcorp] conducts business ("Competitor"), provided, however, that the duties and responsibilities of said employment or engagement as an owner in, shareholder with more than 2% equity interest in, investor in, employee, contractor, consultant, advisor, representative, officer, director or agent are (i) the same, similar, or substantially related to your current duties and responsibilities or duties or responsibilities performed by you while employed by [Labcorp] at any time during a six (6) month period prior to your date of termination and (ii) related to or concerning the Competitor's business activities in the Restricted Territory.

(Farrier Decl. Exh. B.) "Restricted Territory" is defined to include "the geographic area that is part of your ... duties and responsibilities ... within a six (6) month period prior to the date of your termination of employment." (*Id.*)

The Agreement further prohibits Doran from unfairly soliciting customers or prospective accounts of Labcorp (together, the "Customers"), stating in relevant part that:

> During your employment and for a period of 12 months following the voluntary or involuntary termination of your employment, you will not either directly or indirectly through a subordinate, co-worker, peer or other person or entity, call upon, contact, or solicit or attempt to call upon, contact or solicit any customer or customer prospect of [Labcorp], with a view toward the sale or providing of any service or product competitive with the products and services offered by [Labcorp]; provided, however, the restrictions set forth in Paragraph 4 shall apply only to customers or prospects of [Labcorp], or representatives of the same, with which the Employee had contact during the last twenty-four (24) months of your employment with [Labcorp].

(*Id.*)

The Agreement also requires that Doran not disclose the Confidential Information, stating in relevant part:

> [F]or a period of seven (7) years from the termination of your employment, you shall not, without the prior written consent of the [Labcorp], divulge to any third party or use for your own benefit, or for any purpose other than the exclusive benefit of the [Labcorp], any Confidential Information of the [Labcorp]. In this Agreement, Confidential Information shall mean information that concerns [Labcorp's] prices, pricing methods, costs, profits, profit margins, suppliers, methods, procedures, processes or combinations or applications thereof developed in, by, or for its business, research and development projects, data, business strategies, marketing strategies, sales techniques, customer lists, customer information, financial information, or any other information concerning [Labcorp] or its business that is not readily and easily available to the public or to those persons in the same business, trade, or industry of [Labcorp].

(*Id.*)

5

**D.    Doran's Role as a Senior Marketing Executive at Labcorp**

Following his re-hire as a Senior Marketing Executive, Doran reported to Scott Kagan, who in turn reported to Alissa Farrier. (Farrier Decl. ¶ 10.)  In this role, Doran was responsible for growing Labcorp revenue in the Geographic Territory by identifying and closing new Labcorp accounts, and by assisting others in maintaining and growing revenue of existing Labcorp accounts. (*Id*. ¶ 13.) He was also responsible for co-selling with other sales specialists known as Specialty Development Executives ("SDEs"). (*Id*. ¶ 14.)

Doran worked with SDEs to focus his sales in the Specialty Areas. (*Id.*) Doran received substantial commission revenue from the co-selling of testing in the Specialty Areas. (*Id*.) This revenue was a significant contributor in Doran's impressive sales successes, which resulted in, among other things, Doran being named a member of the Labcorp "GEM Club" in 2022 and 2023, a national honor reserved for Labcorp's company-wide top sales employees. (*Id*.)

Because of his senior role and the Specialty Areas in which he focused, Doran was privy to uniquely valuable Confidential Information, including Labcorp's specific products and product pipeline, specific pricing, and pricing and sales strategies in, among other areas, the Specialty Areas. (*Id*. ¶ 15.) Such information would be inordinately valuable to an employee going to work for a competitor and to that competitor, as it would enable both to more effectively, and unfairly, compete with Labcorp, particularly in the Specialty Areas. (*Id*.)

Also because of his senior role and the Specialty Areas in which he focused, Doran routinely participated in meetings concerning the formation and implementation of sales strategies and plans pertaining to the Specialty Areas in particular. (*Id*. ¶ 16.) Those meetings included, among other things, discussions and analysis of the activities of, and competitive threats from, other companies which offer

6

the same or similar products and services as Labcorp. (*Id.*) That confidential analysis could also be used by Doran and a competitor to gain an unfair competitive advantage. (*Id.*)

Finally, his position enabled him to develop close personal relationships with Labcorp's highly coveted Customers in, among other areas, the Specialty Areas. (*Id.* ¶ 17.) Because Doran directly solicited and negotiated agreements with these Customers, he was (and remains) intimately familiar with their present and future needs, and the specific terms of their current contractual relationships with Labcorp. (*Id.)*

All of this Confidential Information is exactly the type of Confidential Information Doran voluntarily agreed not to use in competition with Labcorp when he signed the Agreement.

**E.**     **<u>Doran Voluntarily Resigns From Labcorp and Begins Working for Natera, A Direct Competitor of Labcorp, in Direct Violation of the Agreement</u>**

Doran voluntarily resigned from Labcorp, effective August 23, 2024. (Farrier Decl. ¶ 18.) Shortly after resigning, Doran began working for Natera.  (*Id.* ¶ 19.) Natera directly competes with Labcorp, including in Manhattan, by providing testing and diagnostic services to healthcare systems, hospitals, physician practices, and healthcare providers. (*See* Declaration of J. Walker Coleman IV ("Coleman Decl.") (attached hereto as Exhibit 2), Exhibit F (a true and correct copy of Natera's website).) According to Natera's website, Natera offers the same or substantially similar products and services to those offered by Labcorp, and many of those products and services are the very same products and services that Doran sold to the Customers, including diagnostic testing in the Specialty Areas. (*Id.*; *see also* Farrier Decl. ¶ 20.) In fact, while at Labcop, Doran was provided with highly confidential business material containing strategies to effectively compete directly

7

against Natera in the Specialty Areas. (*See* Farrier Decl. ¶ 26, Exhibit D[1] ("Natera and Labcorp 'Battle Cards'").). Natera is, therefore, indisputably a direct competitor of Labcorp in the Geographic Territory. (Farrier Decl. ¶ 20.)

In one pertinent example, in 2022, Doran represented Labcorp in a presentation to Mount Sinai Health System's internal fetal medicine group, where Natera was Labcorp's main competitor. For the presentation, Doran was privy to highly confidential information comparing Labcorp's testing services, turnaround time, patient service capabilities, and technology to Natera and its offerings. (*Id*. ¶ 21.)

Doran's responsibilities at Natera unquestionably are "the same, substantially similar, or substantially related" to his prior role at Labcorp. (*Id*. ¶ 20, 22.) And, since his departure from Labcorp, he has directly solicited at least six Labcorp Customers "with a view toward the sale or provi[sion]" of services and products "competitive with the products and services offered by [Labcorp]." (*Id*. ¶ 23.) The six Customers are as follows: Maternal Fetal Medicine Associates (Mount Siani), Weil Cornell Department of Obstetrics, BBA Obstretrics (Mount Saiani), Eastside Women's OBGYN, Lennox OBGYN, and physician Alex Tepper, MD (an Obstetrician-Gynecologist) (together, the "Solicited Labcorp Customers"). (*Id*. ¶ 23.; *see also* Declaration of Sam Forte ("Forte Decl."), attached hereto as Exhibit 3, and Declaration of James Schulz ("Schulz Decl."), attached hereto as Exhibit 4.) All of the Solicited Labcorp Customers are in the Specialty Area of women's health and are located in the Geographic Territory. (Farrier Decl. ¶ 23.) And according to Doran's Labcorp sales visit logs, he conducted in-person office visits and scheduled sales appointments with all of the Solicited Labcorp Customers during his last two years of employment at Labcorp, with the exception of one which,

---

[1] Pursuant to LR 5.4(a)(3), a redacted version of Farrier Decl. Exhibit D is attached to Alissa Farrier's Declaration (Exhibit 1)."

according to the sales visit logs, he visited just outside that two year window. (*Id.* at ¶ 24.) Within the last 12 months, Labcorp received revenue from just the Solicited Labcorp Customers of over $1 million. (*Id.* ¶ 23.)

**F.      Labcorp Requests That Doran Cease and Desist His Illegal Activities and Natera Stop Interfering with Labcorp's Contractual Relationships**

After learning of Doran's direct solicitations of the Customers, on October 22, 2024, Labcorp sent certified letters to both Doran and Natera informing them, among other things, of the Agreement, Doran's contractual and legal restrictions, and that Doran's actions, including his direct solicitation of Labcorp's customers, constituted direct breaches of the Agreement. (Coleman Decl. ¶¶ 3,4; *see also* Coleman Decl. Exhibit A and B ("Labcorp's Initial Letters").) Labcorp also requested that Doran immediately cease and desist from breaching the Agreement.  (*Id.*)

Counsel for Natera responded to Labcorp's letter and maintained that its actions were not in breach of the Agreement because Doran's duties and responsibilities for Natera purportedly were not the same as, substantially similar, or substantially related to the duties he performed at Labcorp, nor in the same territories for which Doran was responsible at Labcorp.  (Coleman Decl. ¶ 5; *see also* Coleman Decl. Exhibit C ("Natera's Response Letter").)

Labcorp responded on November 5, 2024, clarifying Doran's duties and responsibilities at Labcorp, providing specific zip codes of the territories for which Doran was responsible during his employment at Labcorp, and affirming that Doran was in fact breaching the Agreement. (Coleman Decl. ¶ 6; *see also* Coleman Decl. Exhibit D ("Labcorp's Second Letter").) Labcorp subsequently exchanged numerous emails with Natera in a good faith effort to resolve this dispute, to which Natera responded by requesting additional time to reply because Natera's counsel was

9

engaged in a multi-week trial. (Coleman Decl. ¶ 7; *see also* Coleman Decl. Exhibit E ("the Email Exchanges").)

Through its communications, Labcorp sought certain assurances from Natera in a good faith effort to resolve Doran's breaches of the Agreement without having to resort to litigation. Despite Labcorp's continued good faith efforts, Natera has permitted and/or encouraged Doran to continue soliciting Labcorp customers.

## ARGUMENT

## I. LABCORP IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

As set forth herein, Labcorp is entitled to immediate injunctive relief because it is likely to succeed on the merits of its claim, it is likely to suffer irreparable harm in the absence of preliminary relief, the balance of equities tips in its favor, and an injunction against Doran and Natera (together, the "Defendants") is in the public interest. *See WV Ass'n. of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009); *Stuart v. Huff*, 834 F.Supp.2d 424, 427 (M.D.N.C. 2011).

### A. Labcorp Will Succeed On The Merits

The first element – whether Labcorp is likely to succeed on the merits of its claims – does not require Labcorp to show a "certainty" of success." *Lab Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 456 (citing *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009)). Rather, "a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.'" *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 813 (4th Cir. 1991). Labcorp exceeds its burden because (i) the Agreement and Restrictive Covenants are legally

valid and enforceable, and (ii) Doran has violated the terms of the Agreement, including directly violating the Restrictive Covenants, with the permission, aid, and/or encouragement of Natera.

### 1. The Agreement Is Valid and Enforceable

Doran's Agreement is governed by North Carolina law pursuant to a choice of law provision. Provisions such as this are valid and respected by North Carolina courts. *See, e.g.,* N.C. Gen. Stat. § 1G-3 *et seq.* (parties to a contract may agree in the contract that North Carolina law shall govern). (*See* Farrier Decl. Ex. B ¶ 9(f).)

Under North Carolina law, non-solicitation and non-compete covenants are analyzed in the same way. *Lab Corp.*, 84 F. Supp. 3d at 458. Doran's non-compete and non-solicit obligations in the Agreement are enforceable under North Carolina law because they are in writing and made as part of an employment agreement, based on valuable consideration, reasonable in scope both as to time and territory, designed to protect a legitimate business interest of Labcorp, and consistent with public policy. *See id.; ABT, Inc. v. Juszczyk*, No. 5:09CV119, 2010 WL 3156542, at *7-8 (W.D.N.C. Aug. 10, 2010);[2] *United Labs. Inc. v. Kuykendall*, 370 S.E.2d 375, 380 (N.C. 1988).

### a. The Covenants Were Made As Part of an Employment Agreement

Doran signed the Agreement on October 15, 2021, as a condition of, and in consideration for, his new employment when he was re-hired by Labcorp. (Farrier Decl. ¶ 8.)

### b. Doran Received Valuable Consideration

Doran entered into the Agreement with Labcorp in exchange for an offer of new employment as a Senior Marketing Executive. (*See* Farrier Decl. ¶ 8, Exh. B.) In North Carolina, "the promise of new employment is valuable consideration and will support an otherwise valid covenant not to

---

[2] Unpublished cases are attached hereto as Exhibit 5.

compete contained in the initial employment contract[.]" *Calhoun v. WHA Med. Clinic, PLLC,* 178 N.C. App. 585, 597, 632 S.E.2d 563, 571 (N.C. Ct. App. 2006); *Wilmar, Inc. v. Corsillo,* 24 N.C. App. 271, 273, 210 S,E.2d 427, 429 (1974) (same).

### c.    The Scope of the Provisions Are Reasonable

The scope of the Restrictive Covenants are entirely reasonable in duration and geographic scope. North Carolina courts routinely enforce restrictive covenants up to two years in duration. *Carlson Envtl. Consultants, PC v. Slayton*, 317-CV-00149, 2017 WL 4225993, at *8 (W.D.N.C. Sept. 21, 2017) ("A two-year noncompetition agreement is 'well within the range that the North Carolina courts have deemed reasonable.'") (internal citations omitted); *Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 717 (M.D.N.C. 2009) ("As a general proposition, a non-competition agreement of two years is 'well within the range that the North Carolina courts have deemed reasonable.'") (internal citations omitted). The time restriction here – one year – is reasonable and shorter than many other approved cases. [3] *See id*.

Labcorp also narrowly tailored the geographic scope of the non-compete provision in the Agreement to prohibit competition only in those specific territories assigned to Doran at the time of his termination and the six months preceding termination.  (*See* Farrier Decl. ¶ 8, Exh. B.)  Courts have found such geographic restrictions reasonable, including where a former employee's territory was nationwide in scope.  *See, e.g.*, *Mkt. Am., Inc. v. Christman-Orth*, 520 S.E.2d 570, 578 (N.C. Ct. App. 1999); *Carlson Env't Consultants, PC v. Slayton*, No. 3:17-CV-00149-FDW-DCK, 2017

---

[3] A North Carolina court granted a TRO providing essentially the same relief Labcorp seeks here based on substantively identical restrictive covenants. *Esoterix Genetic Laboratories, LLC v. McKey et al.*, No. 11-CVS-1379 (N.C. Super. Ct. Alamance County).

WL 4225993, at *8 (W.D.N.C. Sept. 21, 2017); *XPO Logistics, Inc. v. Northrop*, No. 3:19-CV-00348-FDW-DSC, 2019 WL 3543877, at *5 (W.D.N.C. Aug. 2, 2019).[4]

The non-solicit provision is likewise narrowly-tailored to prohibit direct and indirect solicitation of only customers and prospective customers with whom/which Doran had contact during the two years preceding his termination. (*See* Farrier Decl. ¶ 8, Ex. B.) Such a client-based restriction is enforceable in North Carolina. *See, e.g., United Labs.*, 370 S.E.2d at 386; *Wade S. Dunbar Ins. Agency, Inc. v. Barber*, 556 S.E.2d 331, 335-36 (N.C. Ct. App. 2001); *Campbell All. Grp., Inc. v. Forrest*, No. 5:15-CV-667-D, 2018 WL 1513661, at *9-10 (E.D.N.C. Mar. 27, 2018).

### d.       The Covenants Protect Vital Labcorp Business Interests

North Carolina courts maintain that protection of confidential information, client relationships, and goodwill are legitimate business interests that support enforcement of restrictive covenants. *XPO*, 2019 WL 3543877 at *6 ("As this Court has previously observed, longstanding precedent from the North Carolina appellate courts holds that confidential information and goodwill are legitimate interests that support enforcement of noncompetition restrictions."); *see also United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 651 (1988). The Restrictive Covenants here are necessary to provide Labcorp with a reasonable degree of protection against Doran's competitive activities, including his wholesale diversion of Labcorp Customers to his new employer, Natera. Moreover, Courts consistently find that the kind of client relationships that Labcorp seeks to protect here constitute a protectable interest and are reasonably subject to a restrictive covenant. *See Philips,* 631

---

[4] In *Esoterix Genetic Laboratories, LLC v. Goulart*, No. 1:14CV89 (TDS-JLW) (M.D.N.C. Feb. 11, 2014) the Court entered a TRO on the same non-solicit restrictions as present here but declined to rule on the non-compete because of concerns over the nationwide scope and the lack of evidence as to the geographic region where defendant was employed. Since this decision, Labcorp modified its non-compete clause to address concerns the Court raised. And in the present case, unlike *Goulart*, there is ample evidence demonstrating that Doran solicited clients in the Restricted Territory.

F.Supp.2d at 711 (defendant's breach of the non-competition agreement "undermine[d] [the plaintiff's] relationship with its customers and could result in further loss of customer relationships and goodwill").

North Carolina courts also recognize that where an employee has an opportunity "to engage in personal contact with the employer's customer," there exists a greater need for the employer to protect these relationships. *United Labs.*, 370 S.E.2d at 381. "When an employee, during the course of his or her employment, develops or improves customer relationships, the employee is establishing business good will, which is a valuable asset of the *employer.*" *Id.*; *see also Carlson*, 2017 WL 4225993 at *7. North Carolina further notices that "an employee, having such confidential information, is in a position to misappropriate and misuse this information upon employment termination to convert his former employer's business to his own – the precise situation that the employer sought to avoid when it entered into the covenant with the employee." *United Labs.*, 370 S.E.2d at 383; *Meineke Car Care Centers, Inc., v. Catton*, No. 3:10-CV-000234-RLV-DSC, 2010 WL 2572875, at *3 (W.D.N.C. June 24, 2010).

Labcorp retains and attempts to expand its business by, among other things, maintaining good relationships with its Customers. (Farrier Decl. ¶ 3,4.) During his time as a Senior Marketing Executive, Doran developed close business relationships with important Customers in the Geographic Territory. (*Id.* ¶ 17.) Doran was responsible for, among other things, prospecting, developing, and expanding strategically important accounts in the Geographic Territory, particularly in the Specialty Areas. (*Id.* ¶ 12,13.) Labcorp has a legitimate business interest in preserving its relationships with the Customers, and, in particular, protecting itself from competition from a former executive who had frequent, and unique, access to the Confidential Information and significant Customer relationships.

14

Moreover, Doran acquired "valuable information as to the nature and character of [Labcorp's] business and the names and requirements of the patrons or customers." *United Labs.*, 370 S.E.2d at 380-81. As set forth above, by virtue of his senior role and the Specialty Areas in which he focused, Doran obtained intimate knowledge of, among other things, Labcorp's most highly confidential internal strategies, terms, precise customer desires and concerns, pricing, and what specifically was (and would be) required to entice the Customers to shift their business from Labcorp to Natera. (Farrier Decl. ¶ 15, 16.) Simply put, such information would be extraordinarily valuable to a competitor because its disclosure would afford the competitor an unfair opportunity and advantage to counteract Labcorp's pricing, strategies and sales efforts, and potentially convert its business from Labcorp to the competitor. (*Id.*) The only way to protect against such disclosure and use by a competitor, and the resultant unfair competitive advantage the competitor would derive, is to enforce the terms of the Agreement.

### e. The Covenants Do Not Violate Public Policy

The Restrictive Covenants are not unreasonably long, nor do they prevent Doran from competing fairly with Labcorp – or even working with Natera in another role – and they are no broader than necessary to protect Labcorp's legitimate business interests. *See Carlson*, 2017 WL 4225993 at *9. Neither do the Agreement's restrictions impinge on the availability of testing or diagnostic services to the community. On the other hand, the "public interest favors the protection of confidential business information and the enforcement of valid contracts." *ABT, Inc.*, 2010 WL 3156542 at *9.

15

## 2. Doran Has Violated The Terms Of The Agreement With the Permission, Aid, and/or Encouragement of Natera.

Doran has breached, and continues to breach, the Restrictive Covenants through his employment with, and actions on behalf of, Natera, a direct competitor of Labcorp, by performing the same, substantially similar, or substantially related job duties in substantially the same role. (Farrier Decl. ¶ 15, 20, 22.) Indeed, Doran, as an employe of Natera, is (and has been) actively selling the exact same services in the exact same Specialty Areas to the same highly coveted Customers in the Geographic Territory. (*Id.*) It could not be a more blatant violation of the Agreement.

More specifically, as stated above, since joining Natera, Doran has directly solicited Labcorp Customers in the Geographic Territory that include, at least, the six Solicited Labcorp Customers for which he was responsible during the two years prior to his termination of employment in an attempt to sell them the very same services he sold at Labcorp and convert them from Labcorp Customers to Natera Customers. (*Id*. ¶ 23, 24; *see also* Forte Decl., Schulz Decl.) And the potential loss of the Solicited Labcorp Customers could cost Labcorp over $1million, at least, in potential annual revenue from just these six Customers. (Farrier Decl. ¶ 23.)

When confronted with Doran's direct violations of the Agreement, Natera has refused to ensure that Doran adheres to and honors the terms of the Agreement. (*See* Coleman Decl. ¶¶ 4-7; Coleman Decl. Exh. B, C, D, E.) In Natera's Response Letter, it stated, in relevant part, that:

> Rather than being responsive for bringing on new business across Labcorp's broad spectrum of tests, Mr. Doran will have two main responsibilities in his role as a Clinical Field Specialist at Natera. The first will be to manage and service accounts that already send their patients to Natera for genetic testing, and the second will be to engage with potential new genetic testing accounts in areas outside of Manhattan, or in other words, areas that Mr. Doran did not have responsibility for during his final six months of employment with Labcorp.

(Coleman Decl. ¶ 5; Coleman Decl. Exh. C.)

16

However, as noted in Labcorp's Second Letter, Natera's position is misleading and altogether misses the mark. (Coleman Decl. ¶ 6; Coleman Decl. Exh. D.) First, even if Doran is in fact only servicing existing Natera accounts in his prior Labcorp sales territory, this does not mean that he is not pursuing *new* sales for that account. (*Id.*) Indeed, such a distinction would be impractical and essentially impossible to follow in practice. (*Id.*) Additionally, contrary to Natera's second assertion, Doran did have responsibility for genetic testing accounts in his last six months of employment with Labcorp, as he regularly participated in sales efforts with Labcorp's Customers regarding the sale of genetic testing products. (*Id.*; s*ee also* Farrier Decl. ¶ 23, 24.) As discussed above, Doran worked very closely with the SDEs at Labcorp to sell highly lucrative genetic testing in the Specialty Areas to coveted Customers in the Geographic Territory. (Farrier Decl. ¶ 14.) And Doran received substantial sales commission revenue from his co-selling with the SDEs, which resulted in him being named a member of the prestigious GEM Club the last two years of his employment with Labcorp. (*Id.*) Moreover, Doran's Labcorp sales visit logs also demonstrate that he had sales appointments with Customers, including the Directly Solicited Customers, whose needs included genetic testing. (*Id.* ¶ 23, 24.)

Through Labcorp's communications, Doran and Natera have been put on explicit notice of Doran's ongoing breaches and violations of the Restrictive Covenants and the Agreement.

### B.     Doran and Natera Will Continue to Cause Irreparable Injury Unless Enjoined

The North Carolina "Supreme Court has held that 'in a noncompetition agreement, breach is the controlling factor and injunctive relief follows almost as a matter of course.'" *Premier Res. of N. Carolina, Inc. v. Kelly*, 768 S.E.2d 201 (N.C. Ct. App. 2014) (quoting *A.E.P. Indus., Inc. v. McClure*, 302 S.E.2d 754, 761-62 (N.C. 1983) (granting preliminary injunction). This is partly because "the threat of a permanent loss of customers and the potential loss of goodwill ... support

a finding of irreparable harm." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994); *XPO Logistics*, 2019 WL 3543877 at *8 (finding irreparable harm based on "possibility of permanent loss of customers to a competitor or the loss of goodwill"); *Carlson*, 2017 WL 4225993 at *10 (potential loss of customer relationships, goodwill and impairment of employer's competitive position" demonstrated irreparable harm); *Philips*, 631 F.Supp.2d at 711. And the irreparable harm is particularly severe when an employee, restricted by a covenant not to compete, goes to work for a direct competitor, as is the case here. *See Lloyd v. Southern Elevator Co.,* 646 S.E.2d 443 (2007).

Labcorp solicits, retains, and grows business by, among other things, developing and maintaining strong relationships with its customers and prospective customers, developing sales strategies to address the needs of its customers and distinguish itself from its competition, and employing pricing strategies to counteract those of its competitors. (Farrier Decl. ¶ 4.) To do so, Labcorp, among other things, relies on confidential sales strategies and competitive pricing. (*Id.*). As discussed above, Doran has intimate knowledge of Labcorp's highly confidential sales strategies, business plans, and other information, which was only provided to him by Labcorp based on his voluntary agreement to be bound by the Restrictive Covenants. (*Id.* ¶ 8.) He further was privy to invaluable Confidential Information pertaining specifically to Labcorp's strategies to compete with Natera. (*See* Farrier Decl. ¶ 26, Exh. D.) Natera, by employing Doran to perform the very same services in the Geographic Territory that he performed while at Labcorp, is unfairly, and illegally, benefiting from Doran's blatant breaches of the Restrictive Covenants and Agreement. And the fact that Doran is directly competing armed with this uniquely and inordinately valuable Confidential Information makes the illegal and unfair benefit to Natera much greater, and resultant harm to Labcorp even more irreparable.

18

Moreover, Doran had relationships with, and in fact helped to develop, certain Labcorp accounts. (Farrier Decl. ¶ 12.) Due to this knowledge and these relationships, Doran's employment with Natera presents a significant risk that Labcorp will lose its hard-earned Customers, as well as its competitive edge. (*Id.* ¶ 25.) Doran's position with Labcorp "enable[d] [him] to take unfair advantage of the contacts, expertise, inside information, and goodwill he acquired while working for [Labcorp] to benefit ... a company ... which directly competes with [Labcorp]" and, therefore, Labcorp "is likely to sustain irreparable loss without a preliminary injunction." *Lloyd*, 646 S.E.2d at 443.

If, on behalf of Natera and with Natera's encouragement, Doran continues to successfully solicit the Customers, it would be difficult to ascertain what percentage of those accounts would have otherwise continued to choose, or chosen, Labcorp's testing and diagnostic services. (Farrier Decl. ¶ 27.) Moreover, if Doran is able to trade on Labcorp's goodwill and Confidential Information to successfully solicit any of his former accounts, any accounts he successfully converts to Natera represent a potentially permanent loss of revenue to Labcorp because, once an account is lost, it is difficult to get it back, and indeed may never come back. (*Id.* ¶ 28.) It would, therefore, be difficult to accurately assess the monetary damages to Labcorp resulting from Doran's illegal solicitations – facts that further support a finding of irreparable harm. *See e.g.*, *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (money damages difficult to calculate for "loss of a relationship with a client that would produce an indeterminate amount of [future] business"); *Ecolab Inc. v. Paolo*, 753 F.Supp. 1100, 1110 (E.D.N.Y. 1991) (monetary damages insufficient to compensate loss of good will).

The only way to prevent this irreparable injury is to issue a temporary restraining order and preliminary injunction. This is also the remedy to which Doran specifically assented in his Agreement, and about which Natera was (or should have been) aware when it hired Doran:

> [Labcorp] will be placed at a competitive disadvantage in the event that you breach this [Agreement] and that damages would not be an adequate or reasonable remedy in the event of such breach. Accordingly, **you stipulate that in the event that you breach one or more of the provisions set forth in this [Agreement], [Labcorp] will be entitled to an injunction restraining you from violating the terms of those paragraphs**.

(Farrier Decl. ¶ 8, Ex. B (Agreement ¶8(b) (emphasis added).); *see Carlson*, 2017 WL 4225993 at *10 ("The Court also finds that [the former employee] recognized in his [Agreement] that his violation of the noncompetition provisions would cause irreparable harm to [the former employer]."); *XPO Logistics, Inc.*, 2019 WL 3543877, at *8 ("Northrop explicitly acknowledged in her Agreement that a violation of her noncompetition and confidentiality obligations would cause harm to XPO and necessitate injunctive relief.").

## C.    The Balance Of Equities Favors Labcorp

The balance of hardships in this case favors Labcorp, which will suffer irreparable harm if Doran, with Natera's aid and encouragement, is permitted to compete with Labcorp in direct violation of his Agreement. On the other hand, "[t]o the extent that [Doran] suffer[s] significant, and in a sense irreparable, damage" due to the preliminary injunction, "this harm is a predictable consequence of [his] willful breach of contract and [his] misconduct. As such, it is not the type of harm from which we seek to protect a defendant." *Jiffy Lube Int'l v. Weiss Bros.*, 834 F.Supp. 683, 693 (D.N.J. 1993); *see United Labs. Inc.*, 370 S.E.2d at 380 (enforcing the contract "only require[ed] the defendants to do what they agreed to do"); *XPO Logistics*, 2019 WL 3543877 at *8; *Carlson*, 2017 WL 4225993 at *11.

### D. The Public Interest Favors A Temporary Restraining Order and Preliminary Injunction

The "public interest favors the protection of confidential business information and the enforcement of valid contracts." *ABT, Inc.*, 2010 WL 3156542 at \*9. As the North Carolina Supreme Court stated in *United Laboratories Inc. v. Kuykendall*, "[The law] favors the enforcement of contracts intended to protect legitimate interests. It is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." 370 S.E.2d at 380.

## II. LABCORP IS ENTITLED TO EXPEDITED DISCOVERY

To the extent Defendants contest the relevant facts, Labcorp should be granted expedited discovery into Doran's activities on behalf of Natera pursuant to Rule 26(d). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assocs., Inc. v. U.S.*, 917 F.Supp. 841, 844 (D.D.C. 1996); *see also KBG Holding Corp. v. Union Bank & Trust Co.*, 56 Fed.App'x 111, 114 (4th Cir. 2003); *CIENA Corp. v. Jarrard*, 203 F.3d 312, 320 (4th Cir. 2000). In this Court, expedited discovery should be analyzed under "a standard based upon reasonableness or good cause, taking into account the totality of the circumstances," which "is more in keeping with discretion bestowed upon the Court in the Federal Rules of Civil Procedure." *Teamworks Innovations, Inc. v. Starbucks Corp.*, No. 1:19CV1240, 2020 WL 406360, at \*3 (M.D.N.C. Jan. 24, 2020).

Here, expedited discovery would be appropriate for the Court's resolution of factual disputes, if any, prior to the entry of preliminary injunctive relief. Specifically, Labcorp would seek the discovery requested in Paragraph 19 of the Motion, which seeks information sufficient to establish sales activity, job responsibilities, and territory assignments of Doran in the short time he has worked for Natera and to demonstrate that Doran has solicited Labcorp customers in violation of his

Agreement. Defendants would not be prejudiced if ordered to produce the requested information on an expedited basis, as the information is likely available through the deposition of Doran and a corporate representative of Natera and readily available records.

## CONCLUSION

For all the reasons set forth above, Labcorp's Motion for a Temporary Restraining Order and Preliminary Injunction, and for expedited discovery, should be granted in full.


Submitted this 6th day of December 2024.

<div style="margin-left:40%;">

**K&L GATES LLP**

By:    <u>/s/ Leann M. Walsh</u>
Leann M. Walsh
North Carolina State Bar No. 53845
K&L Gates LLP
301 Hillsborough Street, Suite 1200
Raleigh, North Carolina 27603
Telephone: (919) 743-7300
E-mail: leann.walsh@klgates.com

*Counsel for Plaintiff*

</div>

22

CERTIFICATE OF WORD COUNT

The undersigned hereby certifies that the foregoing complies with the type-volume requirements of L.R. 7.3(d)(1) and contains 6,456 words, excluding those portions exempted by the rule.

Submitted this 6th day of December 2024.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed electronically in accordance with local rules and was therefore served electronically on those entities that have properly registered for such electronic service and by United States Mail, first class for those entities not registered for electronic service.

Paul Doran
138 Congress Street, Unit 2
Jersey City, New Jersey 07307

Natera, Inc.
13011 McAllen Pass Suite 100
Austin, Texas 78753

Submitted this 6th day of December 2024

**K&L GATES LLP**

By:     /s/ Leann M. Walsh
        Leann M. Walsh
        North Carolina State Bar No. 53845
        K&L Gates LLP
        301 Hillsborough Street, Suite 1200
        Raleigh, North Carolina 27603
        Telephone:  (919) 743-7300
        E-mail:  leann.walsh@klgates.com

        *Counsel for Plaintiff*